# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| GEORGE WALKER, N-53228, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 13-cv-7237 |
| WEXFORD HEALTH SOURCES, INC., ) | |
| DR. SALEH OBAISI, and WARDEN LEMKE, ) | |
| ) | |
| Defendants. ) | Judge Sharon Johnson Coleman |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff George Walker filed a *pro se* Complaint, alleging that defendants Wexford Health Sources, Inc., Dr. Saleh Obaisi, and Warden Michael Lemke were deliberately indifferent to Walker's serious medical needs following surgery.[1] This Court recruited counsel to represent Walker, who filed the Second Amended Complaint on his behalf, alleging deliberate indifference based on a failure to provide adequate follow-up care to treat a worsening condition after spinal surgery in March 2011. Defendants, Wexford Health Sources, Inc. and Dr. Saleh Obaisi, move for summary judgment [123], arguing that Walker failed to exhaust his administrative remedies and the undisputed facts demonstrate that the defendants were not deliberately indifferent to Walker's serious medical needs. After careful consideration of the parties' written and oral arguments, this Court grants the motion.

**Background**

The following facts are undisputed for purposes of deciding this motion. Plaintiff, George Walker, is a 52-year-old inmate at Stateville Correctional Center. (Dkt. 135, Pl.'s Resp. to Defs.' L.R. 56.1 Statement of Undisputed Facts at ¶ 6). Defendant, Wexford Health Sources, Inc. ("Wexford")

---
[1] Warden Michael Lemke was dismissed from the case by agreement of the parties on March 6, 2017.

is a corporate subcontractor for the State of Illinois, providing healthcare services to inmates at Illinois Department of Corrections ("IDOC") facilities. Defendant, Saleh Obaisi, M.D., is Stateville's Medical Director and an employee of defendant Wexford. (*Id.* at ¶ 7). He received his medical degree in 1960. Dr. Obaisi is trained in general surgery and is board certified in urgent care medicine. He also serves as a Fellow to the Royal College of Surgeons. He began working for Wexford in 2002, serving at various IDOC prisons before becoming Medical Director at Stateville in August 2012. (*Id.*).

Stateville operates a Health Care Unit on-site that provides inmates with multiple medical services. (*Id.* at ¶ 14). The Health Care Unit has an urgent care facility, various medical clinics, and an infirmary. Pursuant to its contract with IDOC, Wexford physicians, nurse practitioners, and physician's assistants are Wexford employees. (*Id.* at ¶ 15).

Medical providers at Stateville follow the IDOC administrative procedures for treating inmates. (*Id.* at ¶ 16). Wexford also has general treatment guidelines for its employees. Stateville's Medical Director is authorized to make non-preapproved referrals to St. Joseph Medical Center if an inmate is suffering from an emergency medical condition. (*Id.* at ¶ 17). All other referrals must go through a physician staffed collegial peer review process that Wexford refers to as UM. Outside referrals are sent to the University of Illinois at Chicago Medical Center ("UIC"). IDOC developed the process to order a non-emergency consultation at UIC. The stated goal of the UM procedure is to eliminate improper referrals and make sure that the inmate receives the right medical treatment. (*Id.* at ¶ 17).

During a UM review, the inmate's case is discussed with the on-site medical director and a team of other physicians including Wexford's UM Director for Illinois, Wexford's Corporate UM nurse, and other staff and physicians from varying medical specialties, as may be needed. (*Id.* at ¶ 18). Typically, the IDOC's healthcare unit administrator also participates in the UM. The collegial

review takes place during a once-weekly telephone conference call. Following the discussion, the physicians at the review either approve the suggested treatment or approve an alternative treatment plan. (*Id.* at ¶ 19). Dr. Obaisi testified that if he was ever dissatisfied with the alternative treatment plan for a patient, he was able to appeal that decision. (*Id.*).

If the UM review approves a UIC consultation, then the UM department enters the information into a Wexford computer program called WexCare, that then sends an electronic copy of that notice to the prison and another electronic copy directly to UIC. (*Id.* at ¶ 20). Once approved, Wexford does not schedule the actual UIC appointment. Appointments are coordinated by UIC and IDOC staff members. The timing of appointments at UIC is entirely at UIC's discretion. Authorizations are valid for 90 days after UM approval. (*Id.*). For surgery referrals, Wexford usually issues a "Global approval," providing approval for both the surgery and any follow-up care needed after the surgery. Dr. Obaisi testified that when follow-up care is included as part of a global approval, UIC will call Stateville directly to set up the follow-up with the patient. (*Id.* at ¶ 21).

*Walker's treatment prior to August 2012:*

On March 1, 2010, a Wexford Physician's Assistant at Stateville performed a physical examination of Walker and noted that he had right leg twitching and reports of weakness. (*Id.* at ¶ 24). The treatment plan was to run bloodwork and discuss his condition with the on-site Medical Director. On March 17, 2010, Wexford approved sending Walker to UIC for an EMG/Nerve Conduction study of his extremities. (*Id.*).

On May 11, 2010, the EMG study suggested myeloradiculopathy in Walker's right leg and UIC recommended further study. (*Id.* at ¶ 25). On May 18, 2010, Wexford's Stateville Medical Director requested a referral for further UIC neurology consultation, which was approved and an appointment scheduled for January 5, 2011. (*Id.*). On October 12, 2010, Wexford's Stateville Medical

3

Director gave Walker a medical permit allowing him to have a low bunk, low gallery (first floor) cell, and special cuffs in order to reduce his pain complaints. (*Id.* at ¶ 26).

On January 5, 2011, Walker was sent for his approved appointment at UIC for a neurological consultation with Dr. Zeidman. (*Id.* at ¶ 27). Dr. Zeidman testified that Walker had a history of one-year of back pain radiating to the right leg, and a foot drop in his right leg.[2] The May 2010 EMG showed radiculopathy and a prior MRI showed disc bulges at several levels, possible narrowing of the cervical spinal canal, which Dr. Zeidman thought was a possible pinched nerve, but he noted no other neurologic dysfunction. Dr. Zeidman recommended another MRI, physical therapy, re-check of blood levels, and consultation with neurosurgery depending on the results of the repeat MRI. (*Id.* at ¶ 27).

On February 7, 2011, Wexford's on-site Medical Director referred Walker to UIC's pain clinic. (*Id.* at ¶ 28). Walker went to UIC's pain clinic on February 8, 2011, where personnel noted a foot drop and radiculopathy, prescribed pain medication and recommended a neurosurgery referral. On February 16, 2011, Walker had an MRI that showed some degenerative arthritis, but no spinal cord signal change, and no change from his prior MRI. Dr. Zeidman recommended referring Walker to a neurosurgeon. (*Id.* at ¶ 29).

On March 11, 2011, Dr. Neckrysh, a neurosurgeon at UIC, examined Walker. (*Id.* at ¶ 30). Dr. Neckrysh recommended "TLIF" spinal surgery to decompress and fuse the lumbar spine. Wexford conducted a UM peer review and gave "global" approval for the surgery and follow-up care. (*Id.* at ¶ 30). On March 23, 2011, Walker underwent spinal surgery at UIC where he remained an inpatient until March 26, 2011. (*Id.* at ¶ 31). Upon his return to Stateville, Walker was admitted to the infirmary, where he was tended to by multiple doctors. (*Id.* at ¶ 31).

---

[2] Plaintiff disputes that he was experiencing pain for the year preceding his consultation with Dr. Zeidman. To support his contention that he did not have back pain, plaintiff refers to testimony from Dr. Davison that did not include back pain as the reason Walker had surgery in March 2011.

4

Between March 26, 2011, and March 29, 2011, five medical notes confirm that Walker's surgical incision was healing well without signs or symptoms of infection. (*Id.* at ¶ 32). On April 7, 2011, Walker's surgical staples were removed, the incision site was cleaned, and no signs or symptoms of redness or infection were noted. Later that day, he was discharged from Stateville's infirmary with minimal discomfort noted, given permits for low bunk, low gallery, and special medical restraints. (*Id.* at ¶ 32). It is undisputed that UIC could have requested a post-operative follow-up appointment, if Dr. Neckrysh thought it was necessary. (*Id.* at ¶ 34).

On April 28, 2011, Walker reported significant resolution of his pain during an examination at Stateville. (*Id.* at ¶ 36). That same day, the physical therapist noted that Walker's surgical scar was well-healed with minor adhesion. Walker completed two eight week courses of physical therapy with an on-site physical therapist at Stateville. (*Id.* at ¶ 37). Although the physical therapist left Stateville, he provided Walker with a Home Exercise Program, consisting of exercises that the inmate could perform in his cell every day. (*Id.*). Walker testified that he followed the physical therapist's instructions and that he completed a total of approximately sixteen months of physical therapy. (*Id.*). Between May 26, 2011, and August 31, 2012, Walker saw Stateville medical providers on eight different occasions reporting improvement to his back following the surgery. (*Id.* at ¶ 36).

*Walker's treatment after August 2012:*

Dr. Obaisi became Medical Director for Wexford at Stateville in August 2012. He first examined Walker on September 26, 2012. (*Id.* at ¶ 38). Dr. Obaisi noted that Walker was complaining of an unsteady gait, weakness in his legs, upper thigh pain, and bilateral foot drop. Dr. Obaisi considered that Walker might have an upper neuron syndrome rather than a muscle disorder because Walker's lab work showed elevated blood enzymes consistent with muscle fatigue. (*Id.* at ¶ 38). Dr. Obaisi also ordered x-rays and provided muscle relaxers and anti-inflammatory medication. He chose to wait for the results from some initial tests before presenting Walker's situation for UM

5

peer review and outside consultation. (*Id.* at ¶ 39). When the results from one of the blood tests were elevated, Dr. Obaisi referred Walker for UM review to approve a neurology consultation at UIC. (*Id.* at ¶ 36). Wexford approved the referral on December 2, 2012, but UIC did not schedule a neurology appointment until April 24, 2013. (*Id.* at ¶ 40).

Between his surgery in March 2011 and Wexford's approval of a UIC neurology consultation on December 2, 2012, Stateville medical providers saw Walker thirty times. (*Id.* at ¶ 41) Seven of the thirty medical consultations were with Stateville's on-site medical director. (*Id.*). Dr. Obaisi again examined Walker on April 9, 2013, for right leg edema that had lasted two weeks. Dr. Obaisi sent Walker to St. Joseph Hospital in Joliet, Illinois, because he was concerned that Walker was developing deep vein thrombosis ("DVT"). (*Id.* at ¶ 42). Emergency medical personnel performed Doppler testing to rule out DVT. (*Id.*).

On April 24, 2013, Walker was sent to UIC for his scheduled appointment with neurologist Dr. Zeidman. (*Id.* at ¶ 43). Walker advised Dr. Zeidman that his back was not bothering him much, but that his legs were still bothering him, and he was having bilateral groin pain. (*Id.* at ¶ 43). Walker refused any pain medication. Dr. Zeidman noted that Dr. Obaisi referred Walker for an evaluation of a possible motor neuron disease based on the elevated bloodwork. Dr. Zeidman ordered a repeat MRI and other imaging tests to check for myelopathy based on the elevated blood tests, and a referral for neurosurgery. (*Id.* at ¶ 43).

On May 14, 2013, Walker had an EMG study. (*Id.* at ¶ 44). On May 23, 2013, Walker had an MRI of the lumbar spine, which showed some degenerative changes at the L3-L4 disc. With Wexford's approval, Dr. Obaisi referred Walker for a neurosurgery consultation at UIC. (*Id.* at ¶ 44). On September 25, 2013, Walker had a follow-up appointment with Dr. Zeidman at UIC. Walker complained of radiculopathy and was now in a wheelchair. Dr. Zeidman noted that tests showed a possible loose screw at S1 vertebrae. Dr. Zeidman recommended re-referral to the neurosurgery

team to consult on the loose screw and another MRI of the cervical and thoracic spine because Walker was showing brisk reflexes in his ankles, which was a new development. (*Id.* at ¶ 45).

On March 27, 2014, Walker returned to UIC's neurology department for follow-up on Dr. Obaisi's referral. (*Id.* at ¶ 46). Dr. Zeidman noted that Walker reported feeling that he was not receiving enough physical therapy. Dr. Zeidman also reported that the MRI was done but the images had not been sent. On that date, Dr. Zeidman noted that Walker was receiving 300 mg Gabapentin for pain twice a day and showing some improvement. (*Id.*).

On October 20, 2014, Walker had another MRI of his cervical spine, which showed degenerative joint disease among other findings. (*Id.* at ¶ 47). Ten days later Dr. Obaisi referred Walker to the UIC pain clinic for treatment for his back and legs. The UIC pain specialist noted that Walker was not taking daily medication, having independently ceased taking all of his pain medications (Gabapentin and Vicodin) because they were making him constipated. (*Id.* at ¶ 48). The pain clinic encouraged Walker to resume taking his pain medication and noted that they would consider a possible epidural steroid injection if surgery was not ordered by the neurosurgery department. (*Id.* at ¶ 48). Walker had another MRI on November 6, 2014, this time of his thoracic spine. (*Id.* at ¶ 49). When compared to the MRI of his thoracic spine taken before the 2011 surgery, there was a similar appearance of mild multilevel degenerative disc disease. (*Id.* at ¶ 49).

On January 8, 2015, Dr. Obaisi referred Walker to UIC neurology for more follow-up care. Walker reported that he had ongoing back pain on his left side, was doing physical therapy once per week, and a change in his medications was helping his pain. (*Id.* at ¶ 50). At that time, Walker was exhibiting slurred speech and hand and finger jerking. Dr. Zeidman referred Walker to neurosurgery and recommended an MRI of the brain in order to evaluate these new symptoms. In the meantime, Dr. Zeidman ordered Walker to continue physical therapy and taking his medication. (*Id.* at ¶ 51).

7

On February 3, 2015, Walker was sent to UIC for an appointment with neurosurgery. (*Id.* at ¶ 52). The neurosurgeon found that Walker had radiculopathy in his left leg and recommended a CT myelogram to delineate any possible neurosurgical issues at the lumbar spine, which was done on May 28, 2015. (*Id.*). On March 27, 2015, Walker had an MRI of his brain that showed non-specific scattered flare changes in the brain, but was otherwise unremarkable and showed no acute or subacute stroke. (*Id.* at ¶ 53).

Walker next saw Dr. Zeidman at UIC on July 1, 2015. He noted no sign of stroke, but observed that Walker was demonstrating problems with "word-finding". (*Id.* at ¶ 54). Dr. Zeidman recommended another neurosurgical follow-up, a speech therapy consultation, and to continue pain medications and physical therapy at Stateville. (*Id.*).

On August 11, 2015, Walker had another x-ray at UIC, which showed "no definitive evidence for hardware malfunction". (*Id.* at ¶ 55). That same day, Walker had a consultation with UIC's neurosurgery service who advised that the myelogram indicated that Walker had some adjacent segment degeneration at L3-4 and a grade 1 spine at L3-4. Neurosurgery advised that they could extend his fusion up to the L3-4 level. (*Id.*).

Walker next returned to UIC neurosurgery on December 22, 2015, when the neurosurgeon who conducted the consultation confirmed that the original 2011 surgery was effective. (*Id.* at ¶ 56). The neurosurgery service recommended a revision and extension of the original 2011 spinal fusion to correct the new issues. Wexford approved the second surgery on January 7, 2016. (*Id.* at ¶ 56). Walker underwent the surgery at UIC on March 30, 2016. (*Id.* at ¶ 57).

While Walker was still at UIC following his second spinal surgery, UIC's medical staff diagnosed Walker with primary lateral sclerosis ("PLS"). (*Id.* at ¶ 58). PLS is a motor neuron disease that causes muscle nerve cells to slowly break down, resulting in weakness in the voluntary muscles that is similar to the more commonly known amyotrophic lateral sclerosis ("ALS"). (*Id.*). UIC speech

8

and psychology staff also consulted with Walker following the diagnosis. (*Id.*). Walker makes no allegations against UIC.

Dr. Nicholas Rizzo testified as plaintiff's expert. He is board certified in internal medicine. He provided the following opinions:

1) Wexford failed to follow the order for a three month post-operative follow-up with the UIC neurosurgeon after Walker's March 23, 2011, surgery.
2) Dr. Obaisi also failed to follow the post-operative order for a follow-up appointment, though Dr. Rizzo acknowledged that Dr. Obaisi was not at Stateville until more than a year after Walker's surgery.
3) Walker's condition deteriorated as a result of not being seen by the neurosurgeon for two years following his March 2011 surgery.
4) There was a lack of routine physical therapy.
5) Walker suffered additional pain as a result of not being treated in an appropriate and timely fashion.
6) Wexford's medical director at Stateville should have ensured that Walker received timely and adequate treatment.
7) Wexford should have had a procedure in place to ensure that orders for follow-up care are followed.

*Grievances:*

Walker admits that he was informed of the grievance process and had the Stateville inmate handbook. (*Id.* at ¶ 75). Walker also admits that he did not file a grievance with Stateville to complain about Wexford medical personnel not sending him back to UIC for a post-surgical follow-up until sixteen months after his March 2011 surgery. (*Id.* at ¶ 74). Walker filed two grievances relating to his medical care; one on April 1, 2013, and one on April 20, 2013. (*Id.* at ¶ 78-9). Warden Lemke testified that the April 1, 2013, grievance was returned to Walker as a non-emergency and directed Walker to follow the standard grievance procedures. (Dkt. 124-1, Ex. D at 23:16-24:4). The Administrative Review Board returned both grievances with the box checked requesting additional information. (*See* Dkt. 136-1, Ex. J, and Dkt. 136-2, Ex. K).

**Legal Standard**

Summary judgment is proper when "the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017), *reh'g denied* (Mar. 27, 2017) (quoting *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014)); Fed. R. Civ. P. 56(a). In deciding whether summary judgment is appropriate, this Court accepts the nonmoving party's evidence as true and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

**Discussion**

Defendants move for summary judgment, arguing that Walker failed to exhaust his administrative remedies and, even if he had, the undisputed facts demonstrate that Dr. Obaisi and Wexford were not deliberately indifferent to Walker's serious medical need. This Court will first address the exhaustion issue.

*1. Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act, 42 U.S.C. §1997(e), includes a strict mandatory exhaustion requirement that disallows any lawsuit brought by a prisoner confined in any jail, prison, or other correctional facility that deals with prison conditions under 42 U.S.C. §1983 or any other federal law, if the prisoner failed to exhaust any administrative remedies and comply with a facility's procedural rules, including deadlines. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). A prisoner will be barred from pursuing a civil action in federal court if his claims have not been exhausted by following the grievance procedure. *Id.*

In Illinois, the standard procedure for prisoners to file grievances requires the submission of a grievance form to their institutional counselor within sixty days after the discovery of the incident, occurrence or problem that gives rise to the grievance. Ill. Admin. Code tit. 20, § 504.810(a). If the inmate is not satisfied with the response to his grievance, he has thirty days from receiving the response to file an appeal with the Administrative Review Board. Ill. Admin. Code tit. 20, § 504.850(a).

Here, Walker complains that he was not sent for his three month follow-up with a UIC neurosurgeon following his March 2011 surgery. Defendants contend that for this claim to be properly before this Court, Walker would have had to submit a grievance within sixty days of June 2011. It is undisputed that Walker's first grievance regarding his medical care was not submitted to prison officials until April 1, 2013. Walker concedes that he did not comply with the standard grievance procedure by submitting his grievance within 60 days of discovering his injury, but argues that he did comply with the emergency procedures.

The emergency procedures allow an inmate to submit his grievance directly to the Chief Administrative Officer; in this case Warden Michael Lemke. Ill. Admin. Code tit. 20, § 504.840. "If there is a substantial risk of imminent personal injury or other serious or irreparable harm to the offender, the grievance shall be handled on an emergency basis." *Id.* The Chief Administrative Officer has the option to treat the grievance as an emergency and expedite a resolution, or the Officer may inform the inmate that the grievance will not be treated as an emergency and the inmate may then proceed with the grievance under the standard procedures. *Id.*

Here, Warden Lemke testified that the April 1, 2013, grievance was returned to Walker with the direction to follow the standard procedures. There is no evidence in the record suggesting that Walker followed this directive. Instead, it appears that Walker submitted his second grievance on April 20, 2013. The second grievance was returned by the Administrative Review Board with a notation for Walker to submit more information or documentation. There is nothing in the record demonstrating that Walker ever submitted the requested information or otherwise followed up. Thus, Walker has not exhausted his administrative remedies.

Walker argues that the Court should excuse any untimeliness because the grievances assert an injury based on a continuing violation. The April 1, 2013, grievances asserts that the defendants

have done nothing in the sixteen months following his March 26, 2011, surgery to provide him with access to medical care that will detect and possibly correct the nerve problem in his right leg.

A prisoner may file one grievance, instead of multiple or a successive grievance, if an objectionable condition is continuing. *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). "Separate complaints about particular incidents are only required if the underlying facts or the complaints are different. Thus, once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement." *Id.* (internal citations omitted). The problem in the case at bar is that Walker did not file any grievance relating to his medical care until nearly two years after the time in which to do so had passed and neither of the grievances were pursued to exhaustion. A finding that Walker has not exhausted his either of his grievances relieves the Court of having to consider the merits of his claims. The Court will nevertheless consider the merits of Walker's deliberate indifference claim.

*2. Deliberate Indifference*

Defendants move for summary judgment on Walker's claim that Dr. Obaisi and Wexford acted with deliberate indifference by delaying post-operative appointments with neurologists at UIC and failing to order tests recommended by outside physicians. Defendants argue that Walker suffers from a degenerative, incurable, motor neuron disease, PLS, that caused and will continue to cause the deterioration in Walker's condition.

Prison officials and employees violate the Eighth Amendment's proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Walker must present evidence of both the objective and the subjective components of deliberate indifference to establish his claim. The objective component requires the prisoner to demonstrate that his medical condition is "objectively, sufficiently serious." *Farmer v. Brennan,* 511 U.S. 825, 934 (1994). In this case, there is no question

that Walker suffers from a serious medical condition. *See Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005) (defining a serious medical condition as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.").

At issue here, is the subjective component, which requires Walker to show that Dr. Obaisi acted with a "'sufficiently culpable state of mind.'" *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)). To survive summary judgment, Walker must present evidence creating an issue of fact that Dr. Obaisi knew of and disregarded an excessive risk to Walker's health. *See Greeno,* 414 F.3d at 653 (quoting *Farmer,* 511 U.S. at 837). In other words, Dr. Obaisi must have been aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and Dr. Obaisi must also draw the inference. *Id.* This standard does not mean that Walker must show that Dr. Obaisi intended to harm him or desired the harm to occur. It is enough for Walker to show that Dr. Obaisi knew of a substantial risk of harm to Walker and disregarded it. *See Id.* Where, as here, the claim relates to a delay in medical care, Walker does not need to show that he was "literally ignored." *Sherrod v. Lingle,* 223 F.3d 605, 611 (7th Cir.2000). However, Walker must show "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Collins,* 462 F.3d 757, 762 (7th Cir. 2006) (quoting *Duane v. Lane,* 959 F.2d 673, 677 (7th Cir.1992)). Isolated incidents of delay are insufficient to establish a deliberate indifference claim; instead, the Court looks at instances of delay within the totality of the medical care the inmate received. *See Walker v. Peters,* 233 F.3d 494, 501 (7th Cir.2000).

In this case, it is undisputed that between his surgery in March 2011 and December 2, 2012, when Wexford approved another consultation with neurosurgery at UIC, Walker saw Stateville medical personnel thirty times, including seven visits with the medical director (Dr. Obaisi after August 2012 and his predecessor prior to that date). Walker argues that the fact that he received

13

some treatment does not negate the possibility that the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Greeno,* 414 F.3d at 654 (quoting *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir.1996)). Dr. Rizzo, plaintiff's retained expert, criticizes the lack of a three-month post-operative follow-up appointment after Walker's March 2011 surgery, including a failure by Dr. Obaisi to follow that order. Dkt. 124-1, Ex. F, Rizzo Dep. at 20:1-5; 45:19 – 46:9. Dr. Obaisi could not have sent Walker for a follow-up within three months of his surgery because Dr. Obaisi did not begin his employment at Stateville until August 2012.

Neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference. *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir.2010) (citing *Estelle v. Gamble,* 429 U.S. at 106). All of plaintiff's expert's opinions concern the three month post-operative follow-up appointment that did not happen. Dr. Rizzo did not testify to specific opinions relating to the care and treatment that Dr. Obaisi actually provided. Instead, Dr. Rizzo testified that he had not opined that Dr. Obaisi disregarded an excessive risk to Walker's health. *See* Dkt. 124-1, Ex. F, Rizzo Dep. at 84:8-11. Although Dr. Rizzo speculated that a follow-up appointment after six-months may have helped preserve continuity of care, he provided no opinions, and was not asked, whether a follow-up appointment with the neurosurgeon would have accomplished anything when Dr. Obaisi joined Stateville more than a year later. *Id.* at 66:8-22. Indeed it is undisputed that Dr. Obaisi examined Walker on September 26, 2012, requested a UM review to send Walker to UIC for a neurological consultation, and Wexford's UM review approved the request on December 2, 2012. It is undisputed that UIC scheduled to the appointment with neurosurgery on April 24, 2013. In the interim, Walker returned to Dr. Obaisi on April 9, 2013, after two weeks of swelling in his right leg. Dr. Obaisi sent him to the emergency department at St. Joseph out of a concern that Walker was developing a blood clot or deep vein thrombosis. Tests ruled out DVT.

This case is similar to the situation recently considered by the Seventh Circuit in *Kyles v. Williams*, 679 Fed. Appx. 497, 2017 WL 946743 (7th Cir. Mar. 9, 2017).[3] In *Kyles*, the prisoner plaintiff complained that the prison and medical personnel were deliberately indifferent to his serious medical needs by limiting his physical therapy and for not scheduling a post-operative reevaluation of his knees. *Kyles*, 2017 WL 946743 at *1. The court of appeals considered the merits of Kyles' claims even though it held that the district court had properly found that Kyles did not exhaust his administrative remedies as to one of his grievances. *Id.* at *2. On the merits, the court found that the lack of evidence of causation suggesting that the absence of physical therapy caused his knees to "pop" or impaired his healing was fatal to his claim and summary judgment in favor of the defendant was appropriate. *Id.* at *3. The court further held that the frequent attention by staff in the medical unit during the period covered by his grievance was not deliberate indifference. *Id.* It was undisputed that the defendants examined the plaintiff for knee pain in May 2010, July 2010, September 2010, and the following January 2011, and each time prescribed pain medication and directed him to follow-up as needed. *Id.* Likewise, here, it is undisputed that Walker saw medical personnel at Stateville, including Dr. Obaisi, on numerous occasions and the only testimony to touch on causation was speculative about what could have been done had Wexford personnel returned Walker to UIC for a post-operative follow-up within three months of his 2011 surgery. There was no testimony connecting Walker's condition to this or any other failure by Dr. Obaisi.

Wexford also moves for summary judgment on Walker's claim that Wexford has a policy of delaying and deferring medical care. In the section 1983 context, there is no *respondeat superior*, therefore, Wexford cannot be held vicariously liable for the failure of its employees and no other Wexford employee is named. *See Hahn v. Walsh*, 762 F.3d 617, 639 (7th Cir. 2014). However, "'[p]rivate corporations acting under color of state law may, like municipalities, be held liable for

---

[3] The Court recognizes that *Kyles* is a non-precedential order. However, it is persuasive due to its similarity to the case at bar.

injuries resulting from their policies and practices.'" *Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014) (quoting *Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650, 675 (7th Cir.2012)). "An official policy or custom may be established by means of an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650, 675 (7th Cir. 2012) (citing *e.g., Milestone v. City of Monroe, Wis.,* 665 F.3d 774, 780 (7th Cir.2011); *Waters v. City of Chicago,* 580 F.3d 575, 581 (7th Cir.2009)). Walker must show a causal connection between his injury and Wexford's official policy or custom. *Hahn,* 762 F.3d at 640.

Although Walker attempts to show a series of delays in his medical care, the undisputed evidence shows that some of the alleged delay was the result of UIC scheduling of appointments. Further, there is no evidence of a causal connection between Walker's deteriorating condition and any delay between appointments with neurologists or neurosurgeons at UIC. Walker was examined thirty times by medical personnel at Stateville, including seven visits with the medical director. Moreover, the undisputed fact that Walker did not file a grievance until two years after his initial surgery suggests that he did not have significant concerns about his care and treatment. The record also does not show any instance where the medical director requested additional care, outside care, and his recommendation was denied by Wexford. Plaintiff's medical expert testified that he could not recall Wexford's policies and procedures in 2011 with regard to sending inmates for follow-up care, though he opined that there should have been one in place. Dkt. 124-1, Ex. F at 91:21-92:19. The evidence in the record fails to establish sufficient causal connection between Wexford's policies and Walker's condition to establish a genuine issue of fact on Wexford's liability.

**Conclusion**

The Court is not unsympathetic to the severe and degenerative condition from which Walker suffers. The undisputed factual record is insufficient to allow his claims to proceed to a jury. In addition to his claims being barred by a failure to exhaust his administrative procedures, they must also fail on the merits. Dr. Obaisi, the only individual defendant, did not join Wexford at Stateville until more than a year after Walker's March 2011 surgery, after which he claims Wexford should have sent him for post-operative follow-up. When Dr. Obaisi examined Walker, he recommended review for neurological consultation at UIC. The recommendation was approved and UIC scheduled Walker for an appointment in neurology. While it was six months between Dr. Obaisi's examination and UIC scheduling an appointment, there is nothing in the record to support an inference that something could have been done differently in that time frame that would have altered Walker's condition. There is likewise scant evidence of a causal connection between Wexford's alleged policy of delaying medical care and Walker's condition.

Based on the foregoing discussion, this Court grants summary judgment in favor of defendants.

IT IS SO ORDERED.

Date: August 11, 2017

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge